**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**LAURA S. McALISTER,**

      **Plaintiff,**

**v.**                                 **No. 10cv0728 JCH/WDS**

**Sergeant GLENN TRUJILLO, Officer**
**WAYNE HARVEY, Officer MARVIN GOKE,**
**Police officers of the New Mexico State Police, in**
**Their Individual and Official capacities,**

**and**

**Captain LARRY HALL, a law enforcement officer**
**Employed by the New Mexico State Police, Motor**
**Transportation Division, in his Individual and**
**Official capacity,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants Sergeant Glenn Trujillo's and Captain Larry Hall's motion seeking summary judgment in their favor on Plaintiff Laura S. McAlister's remaining Fourth-Amendment claims for an allegedly unlawful arrest and detention, filed March 26, 2012 [Doc. 59]. After reviewing the briefs and evidence submitted by the parties as well as the applicable authorities, the Court concludes that the motion for summary judgment should be granted because, as a matter of law, McAlister was never arrested and cannot establish the violation of a constitutional right.

### LEGAL STANDARD

Summary judgment generally is appropriate when a court determines that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a)[1]; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that a summary-judgment movant need not negate all the nonmovant's claims, but need only point to an "absence of evidence to support the nonmoving party's case"). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment-showing that there are no genuine issues of material fact and that he . . . is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted). The Court views the undisputed facts in the light most favorable to the non-moving party. *See Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J*, 464 F.3d 1182, 1188 (10th Cir. 2006).

## UNDISPUTED FACTS

---

[1] Rule 56 was amended, effective December 1, 2010. The summary judgment standard previously enumerated in subsection (c) was moved to subsection (a), and there was one word change from the previous version – genuine 'issue' became genuine 'dispute.' *See* Fed. R. Civ. P. 56 advisory committee note (2010 Amendments). But the 'standard for granting summary judgment remains unchanged.' *Id.*

In 2007, McAlister was employed by the New Mexico Department of Public Safety's ("DPS") Motor Transportation Division ("MTD") as a Patrol Officer, after having served as a certified law-enforcement officer in various positions since 2001. *See* Doc. 62 at 6, ¶ 1 (McAlister's statement of undisputed facts). McAlister's job was to respond to any request for assistance from any other state-police officer in situations involving a commercial motor vehicle. *See* Doc. 59, Ex. A at 2 (McAlister's Deposition). On August 31, 2008, before she got off work at around 10:15-10:45 p.m., McAlister exchanged electronic "CAD" messages with a fellow[2] state-police officer, Marvin Goke. *See* Doc. 62 at 6, ¶ 2. McAlister told Officer Goke that McAlister's cousin was "coming over" to McAlister's house "to drink," and when Officer Goke responded, "I want to party, too," McAlister told him to "come on over, BYOB," which McAlister agrees "is an acronym for bring your own beverage or bring your own beer." *See* Doc. 59, Ex. A at 5. McAlister states, however, that she was teasing and did not drink alcohol that night. *See id.* at 6. At around 1:30 a.m. that evening/early morning, before she had gone to bed, McAlister received a call from her supervisor, Captain[3] Hall, "asking her to go out to a fatal commercial vehicle accident that occurred relatively close to Plaintiff's residence." Doc. 62 at 7, ¶ 3; Doc. 59, Ex. A at 12. McAlister arrived at the accident scene around 2:15 a.m. *See* Doc. 62 at 7-8, ¶ 4; *id.* at 13, ¶ 13. Sergeant Trujillo, a state-police officer, was "in charge" of investigating the accident scene. Doc. 62, Ex. A at 7. At the scene, McAlister spoke with state-police officers Trujillo, Goke, and Harvey. *Id.* at 7, 8. Officer Harvey came up to Sergeant Trujillo and stated, "I smell alcohol on [McAlister]." Doc 62, Ex. D

---

[2] Both the MTD and the State Police are "within the umbrella of the Department of Public Safety." Doc. 59, Ex. A at 2. The Deputy Secretary of the DPS also serves as the Chief of the State Police and "oversees all of law enforcement," including the MTD. Doc. 59, Ex. D at 2.

[3] At that time, Officer Hall was apparently a Lieutenant.

at 2. Sergeant Trujillo then asked Officer Goke to "[d]iscretely go . . . where [McAlister] is and see if you can confirm the odor of alcohol, because [Harvey] says he smells it." *Id.* at 3. Officer Goke talked to McAlister, then returned and said, "Yeah, [] I can smell alcohol. She was having a party." *Id.* McAlister was sitting in her patrol car, writing up her report, when Sergeant Trujillo approached her at around 3:50 a.m. When she rolled down the window to talk with him, Sergeant Trujillo states that he also "smelled alcohol on her." *Id.* According to McAlister, Sergeant Trujillo told McAlister, "the other officers thought they may have smelled alcohol on [her] breath and he thinks he may smell it too.[4]" Doc. 59, Ex. A at 8. McAlister denied drinking, *see* Doc. 59, Ex. D at 4, but she asked Officer Trujillo "what he wanted [her] to do . . . sit here . . . do field sobriety,?" to which Trujillo responded that a field sobriety test was not necessary and that he was going to make some phone calls, Doc. 59, Ex. A at 8.

Sergeant Trujillo called his District Commander, Captain Pete Kassettas, who, in turn, called Chief Segotta (the Chief of the State Police and the Deputy Secretary of the DPS). Doc. 59, Ex. D at 4. Captain Kassettas called Sergeant Trujillo back and told him, "by order of [] Chief Segotta, . . . [McAlister] was going to probably be submitted to a breath test." *Id.* Sergeant Trujillo states that Chief Segotta required McAlister to submit to the breath test "in accordance with the drug and alcohol policy in the workplace." *Id.* at 5. Captain Kassettas ordered Sergeant Trujillo to make sure that McAlister didn't "drive her vehicle . . . and make sure it's relocated to the office." *Id.* at 4. Sergeant Trujillo then asked McAlister for her keys and told her that, "per Captain Kassettas and Chief Segotta, she's being required to submit to a breath test, and she was going to have to come

---

[4] Sergeant Trujillo stated that he told McAlister, "I have two officers that could smell alcohol on you." Doc. 59, Ex. D at 3. The Court has viewed the evidence in a light most favorable to McAlister.

with me to the office." *Id.* Sergeant Trujillo states that he was the Chief's "messenger," and that

he "was following orders." *Id.* at 5. He never told McAlister that she was under arrest and never

arrested her. *See id* at 5; *see also* Doc. 59, Ex. A at 9. McAlister went with Sergeant Trujillo to the

Los Lunas Substation at around 4:09 a.m., riding as a passenger in the front seat of Sergeant

Trujillo's car while Officer Harvey followed in McAlister's patrol car. Doc. 62 at 11-14, ¶¶ 10-14;

Doc. 59, Ex. D at 7. They took her to the "officer room," where officers fill out their paperwork.

Doc. 62 at 14, ¶ 16. Sergeant Trujillo told McAlister that, "according to policy . . . [she] needed to

submit to a breath test," and when McAlister said she "wanted to read the policy," Sergeant Trujillo

printed out the policy and read the relevant paragraph to her, which, in essence, said that "any officer

who is suspected of consuming alcoholic beverages must submit to a breath test when requested."

Doc. 59, Ex. A at 10. McAlister acknowledges that Sergeant Trujillo told her, "this was an

administrative investigation." *Id.* at 21. Sergeant Trujillo was not familiar with union or internal-

affair investigations, and he was never ordered to inform McAlister of her rights under *Garrity v.

New Jersey*[5]. *See* Doc. 59, Ex. D at 5-6; Doc. 59, Ex. A at 16. But McAlister never requested a

---

[5] In *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." The Tenth Circuit has noted that the Supreme Court has clarified this holding to mean that

> a police officer may be terminated for refusing to answer questions "specifically, directly, and narrowly relating to the performance of his official duties," so long as he is not "required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself." *Gardner*, 392 U.S. at 278, 88 S. Ct. at 1916; *accord Hester v. Milledgeville*, 777 F.2d 1492, 1495-96 (11th Cir.1985); *Gulden v. McCorkle*, 680 F.2d 1070, 1074 (5th Cir.1982) ("[I]t is the compelled answer in combination with the compelled waiver of immunity that creates the Hobson's choice for the employee."), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983).
> . . . .

union representative because she had decided she "was going to let them do what they were going to do." *Id.* at 16; *see id.* at 19 (stating, in response to the question whether she ever asked Sergeant Trujillo or her supervisor, Captain Hall, whether she was under arrest or going to be prosecuted for anything "I don't think I actually did. Like I said, I was letting them do what they were going to do."). Instead, McAlister used her cell phone to call Captain Hall, whom she "trusted . . . completely," *see id.* at 14, to ask his advice about what she should do. *See id.* at 13. Captain Hall told her to take the breath test, but she responded that she was not going to take it, even though she "realized that it would be considered insubordination" because it "goes against the policy." *Id.* After McAlister talked with Captain Hall, which was around 4:13 a.m.[6], but before Sergeant Trujillo

---

Thus, police officers, as public employees "may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions." *Turley*, 414 U.S. at 79, 94 S. Ct. at 323. Moreover, the protections afforded the officers in such a case are substantial: "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460, 92 S. Ct. at 1664-65. . . . .

*Garrity's* protection, therefore, acts to immunize these compelled statements, as it prohibits their subsequent use against the officer so as not to offend the Fifth Amendment privilege.

*Grand Jury Subpoenas Dated Dec. 7 and 8, Issued to Bob Stover, Chief of Albuquerque Police Dep't. v. United States*, 40 F.3d 1096, 1101-1103 (10th Cir. 1994). A *Garrity* statement, therefore, simply advises an officer that her "statements, when given under threat of discharge, cannot be used against [her] in subsequent criminal proceedings." *Id.* at 1102 n.5.

[6] After talking with McAlister and ordering her to take the breathalyzer test, Captain Hall called dispatch at 4:14 a.m. to let them know he was going to the Los Lunas substation. *See* Doc. 59, Ex. D at 7.

took her to the room where the breathalyzer machine was located, at around 4:27 a.m.[7], McAlister

asked if she could go outside to smoke, and Sergeant Trujillo told her "no, you sit right there." *Id.*

at 12, 13. McAlister states that she knew that Captain Hall was giving her an order to take the test.

*Id.* Nevertheless, when Sergeant Trujillo and Officer Harvey took her into the breathalyzer room,

McAlister twice refused to take the breath test. *See* Doc. 62 at 17, ¶¶ 22, 23. After McAlister

refused to take the breathalyzer test, she was told that Captain Hall was on his way to the Los Lunas

substation. *See* Doc. 59, Ex. A at 16-17. Colonel Smith, the Chief of the MTD, contacted Captain

Hall before he arrived at the substation and ordered him either to fire McAlister or permit her to

resign for refusing to take the breathalyzer test. *See* Doc. 59, Ex. H at 2. Captain Hall and Sergeant

Lennig (another MTD officer) came to the substation, took McAlister into a room with a tape

recorder, and told her, "resign or be fired," and McAlister asked whether there should first be an

internal-affairs investigation. Doc. 59, Ex. A at 13-14. When she chose to resign instead of to be

fired, Captain Hall required McAlister to write a letter of resignation that noted her refusal to follow

the alcohol policy. *See id.* at 14. After she submitted the letter, Sergeant Lennig drove McAlister

home in McAlister's former patrol car, with McAlister sitting in the passenger seat. *Id.* at 16.

McAlister was paid overtime for the entire time she was investigating the accident and sitting at the

Los Lunas substation. *See id.* at 17. McAlister was never charged with any criminal offense, and

her license was not automatically suspended for refusing to submit to a breathalyzer test, as is

required for individuals who are arrested on suspicion of drunk driving. *See id.* at 11, 19.

McAlister rescinded her resignation after talking with an attorney, and an internal

investigation was held, during which proceedings she acknowledged disobeying a direct order and

---

[7] The breathalyzer machine was "cycled" the first time for McAlister's test at 4:28 a.m. *See* Doc. 62 at 22.

being insubordinate.  *See id.* at 19.  After the internal investigation was completed, McAlister renewed her resignation.  *See id.* at 22.  She stated at her deposition that she did not believe that "anything [Captain Hall] requested at any time during [her] employment . . . [and] as [her] supervisor was inappropriate or unreasonable."  *Id.* at 20.

## ANALYSIS

McAlister raised a Fourth-Amendment claim for false arrest and detention for the first time in her response to the Defendants' motion to dismiss.  *See* August 8, 2011 Memorandum Opinion and Order ("MOO") at 11-12.  In the Court's August 8, 2011 MOO dismissing all of McAlister's claims against all Defendants except for the Fourth-Amendment claims for unlawful arrest and detention against Defendants Trujillo and Hall, the Court noted that it was "not entirely clear from the allegations in the amended complaint whether she was actually arrested, or whether Trujillo and Hall interacted with her on an administrative basis as an employee."  Aug. 8, 2011 MOO at 10.  In allowing these claims to go forward, the Court explained,

> [s]everal facts alleged by McAlister support the inference that she had been first detained, then arrested, within the meaning of the Fourth Amendment.  First, Trujillo, who was neither McAlister's supervisor nor even a member of the same law enforcement organization, asked her for the keys to her patrol car and drove her to the police station in his own police vehicle.  The fact that Trujillo had no supervisory authority over McAlister tends to weaken a suggestion that this was merely an administrative, employment-related event.  Second, although Trujillo initially questioned McAlister in the officers' area, he later moved her to a private room, further suggesting that McAlister was not free to leave.  Third, though Trujillo claimed that the breath test was required pursuant to an employment policy, he refused to show the policy to McAlister.  McAlister alleged that she did not feel as though she was free to leave, though if she believed she could be fired for departing the police station, that does not necessarily transform the event into an arrest.  Finally, no one read McAlister her constitutional rights, a fact that could weigh in favor of either an employment-related administrative event or a Fourth Amendment violation, if McAlister had indeed been arrested.  Though it presents a very close question, the Court concludes that, viewed in the light most favorable to McAlister, she has alleged sufficient facts to support a claim that she was first detained, and then arrested, within the meaning of the Fourth Amendment.

*Id.* at 10-11. The undisputed facts set forth above now conclusively demonstrate that McAlister was not arrested as a matter of law. As noted above, it is undisputed that Sergeant Trujillo detained and then transported McAlister to the state-police substation because he was ordered to take her there for a breathalyzer test by Deputy Secretary Segotta, who has authority over all DPS employees, including McAlister. Although McAlister argues that Deputy Secretary Segotta was not in her "direct chain of command," she admits that he is administratively in charge of the DPS and "creates policies and procedures," *see* Doc. 62 at 4, ¶ 8. Further, it is undisputed that McAlister was not taken to the room where the breathalyzer machine is located until after her direct supervisor, Captain Hall, had again ordered her to take the test. It is now undisputed that, not only did Sergeant Trujillo print out, read, and hold the printed DPS alcohol policy so that McAlister could see it, she understood that he had been ordered to administer the alcohol test pursuant to that policy. And it is undisputed that Sergeant Trujillo never considered McAlister to be arrested, which was why he did not Mirandize her or apply the implied consent DUI statutes. *See* Doc. 59, Ex. 4 at 5-6.

McAlister admits that, if Sergeant Trujillo's actions had been an arrest, "I would be booked. There would be a booking sheet and field report. I would have taken field sobrieties but none of these things were done." Doc. 59, Ex. A at 19.

The reasons McAlister now gives for suggesting that she *may* have been arrested are because she could not leave after Sergeant Trujillo took her patrol car; Sergeant Trujillo did not give her "*Garrity*" warnings before trying to get her to take the breath test or offer her a union representative as required by Department policy for internal investigations; and because Sergeant Trujillo told her she could not go outside to smoke just before she was taken into the room for the breath test. *See id.* at 19; *id.* at 21. These facts, however, do not establish that McAlister was arrested.

In cases involving the constitutional rights of police officers as employees, a court "must

distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state." *Driebel v. City of Milwaukee*, 298 F.3d 622, 638 (7th Cir. 2002) (rejecting argument "that a patrolman is seized, within the meaning of the Fourth Amendment, at the time that he is ordered to report for questioning at a designated, centralized area, such as the headquarters for the internal affairs department (wherever it may be located) or some other suitable location determined by the superior officer"). As the Supreme Court noted in *INS v. Delgado*, "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." 466 U.S. 210, 218 (1984). Here, it is undisputed that Sergeant Trujillo did not independently choose to detain or question McAlister on his own authority as a state police officer; he simply followed the Deputy Secretary Segotta's orders to secure McAlister's DPS patrol car and take it to a DPS office and to inform McAlister – an on-duty officer/employee suspected of having ingested alcohol before she came on duty – that he had been ordered to take her for an administrative alcohol breathalyzer test, as required by DPS administrative policy. Because McAlister's right to total freedom of movement was restricted by a factor independent of Sergeant Trujillo's police conduct – *i.e.*, by their superior officer ordering her to be driven to a DPS office to take a breathalyzer test – the "free to leave" analysis on which McAlister relies is inapplicable. *Cf. Delgado*, 466 U.S. at 218 (holding that no seizure occurred because, even though the workers were not free to leave the building without being questioned, the agents' conduct should have given employees "no reason to believe that they would be [further] detained if they gave truthful answers to the questions put to them or if they simply refused to answer"); *Florida v. Bostick,* 501 U.S. 429, 436 (1991) (holding that, even though bus passenger was not "free to leave" because he was on a bus, the reason he was not free to leave was *not* because he had been seized, but because of an

independent factor). McAlister points to nothing that Sergeant Trujillo did or said that would cause a reasonable, innocent police officer in her circumstances to believe that she was not free to leave the DPS substation after she complied with the orders given by her supervisors. *See Bostick*, 501 U.S. at 438 (noting that "the 'reasonable person' test presupposes an *innocent* person") (italics in original). In fact, the record seems clear that Sergeant Trujillo had nothing to do with McAlister at all after he complied with Deputy Secretary Segotta's order to have the breathalyzer test administered and Captain Hall arrived at the substation. And McAlister states that Captain Hall did nothing wrong.

Because the record conclusively demonstrates that McAlister was never arrested or seized by Sergeant Trujillo as part of a criminal investigation, but, rather, was required as part of her employment as a DPS officer to be driven to the DPS substation and to submit to a breathalyzer test, McAlister has not demonstrated that Sergeant Trujillo violated her constitutional rights. Therefore, judgment will be granted in favor of Defendants and McAlister's remaining Fourth-Amendment claims will be dismissed with prejudice.

**IT IS ORDERED** that the Defendants' motion for summary judgment [Doc. 59] is GRANTED and McAlister's Fourth-Amendment claims are DISMISSED WITH PREJUDICE.

UNITED STATES DISTRICT JUDGE